```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF VIRGINIA

                       Alexandria Division


UNITED STATES                    )
                                 )
        Plaintiff,               )
                                 )            1:07cr404 (JCC)
        v.                       )
                                 )
PAUL GUILD,                      )
                                 )
        Defendant.               )
```

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant's Motion to Dismiss the Indictment for Violation of his Constitutional Rights Under *Kastigar v. United States*. For the following reasons, this motion will be denied.

### I. Background

This case arises out of alleged misconduct by Paul Guild ("Defendant") in Kiev, Ukraine, where he was performing a tour of duty as Regional Supervisory Executive Officer for the United States Agency for International Development ("USAID").

During the summer of 2007, John Doe 2 ("JD2"), a minor, lived with the Guild family. Mr. Guild acted as an academic mentor for both JD2 and John Doe 1 ("JD1"), also a minor, in his home, during which time Mr. Guild allegedly sexually abused JD1 and JD2. After a conversation with his mother and stepfather about the abuse, which was reported to Medical Officer Marilyn

Prekup ("Ms. Prekup"), JD1 was interviewed on August 5, 2007. Regional Security Officers Agent David Walsh ("Agent Walsh") and Agent Ronnie Catipon ("Agent Catipon"), agents with the Diplomatic Security Service of the United States Department of State (DSS), conducted the interview. During the interview, JD1 reported that Mr. Guild had instigated inappropriate sexual contact with him several times during the summer and that JD2 had been with him, and been similarly abused, on several of those occasions. In addition, JD1 informed the agents that JD2 was on vacation and would be back in Kiev later that evening.

After the interview, Special Agent Lynn Falanga ("SA Falanga") of the DSS was contacted for guidance. She ordered the agents to remove JD2 from the Guild's home, and when he arrived to Kiev that evening, he was placed with Ms. Prekup until he could return to the United States. Agents contact his mother to inform them of the abuse reported by her son. Ms. Prekup contacted JD1's stepfather, who was stationed in Iraq, to inform him that allegations had been made by his stepson. They remained in occasional telephone contact over the next several days until he was able to return to Kiev

The evening of August 5, 2007, Mr. Guild was asked to come to the office of the USAID Director and was questioned by Agents Walsh and Catipon regarding the abuse allegations. Guild signed a form stating that he had "been granted use immunity,"

2

precluding the use of any of his answers and "evidence derived from the answer" from being "used against [him] in any criminal proceeding, except for perjury or false swearing." Mem. in Sppt. of Def's Mot. to Dismiss the Indictment for Violation of his Constitutional Rights Under *Kastigar v. United States* Ex. A. Following the interview, Guild was ordered out of the country pursuant to an order of "involuntary curtailment," immediately terminating his tour of duty, and was issued travel orders for the following day.

SA Falanga held a meeting with members of the United State's Attorney's Office for Maryland on August 8, 2007, at which point the immunity agreement was discovered. The case was then assigned to agents with no knowledge of what had occurred previously, Special Agents Edward Allen ("SA Allen") and Jason Griffin ("SA Griffin"), who were also instructed not to speak with anyone who had previously been involved in the case. SA Allen attended the videotaped interview with JD2 on August 9, 2007 at Safe Shores in Washington, D.C. JD1 was also brought to the United States and, on video, was interviewed by a social worker on August 15, 2007, after the original agents on the case had been removed. A Safe Shores employee, Diamond Vann, who had learned of the case before August 8, 2007, watched the interview from an adjoining room, but did not participate. Subsequent interviews of JD1 and JD2, their mothers, JD1's stepfather, and

others in the case were performed by the new agents or prosecutors on the case. Ms. Prekup was present for a November 7, 2007 interview of JD1 at his home in Kiev in her role as Medical Officer. None of the persons interviewed after Defendant were made aware of the content of his immunized statement.

On November 29, 2007, Defendant filed a Motion to Dismiss the Indictment for Violation of his Constitutional Rights Under *Kastigar v. United States*. The Court began a Kastigar hearing on Friday, December 14, 2007, and continued it on January 17 and 18, 2008. This Motion is currently before the Court.

## II. Standard of Review

When a person has been granted use immunity for his testimony and is subsequently prosecuted, the burden of proof is on the prosecution "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460 (U.S. 1972). In order to determine if the government is rightfully "prosecut[ing] a previously useimmunized witness, the district court must hold a so-called Kastigar hearing to allow the government the opportunity to demonstrate that all its evidence came from sources independent of the compelled testimony." *United States v. Harris*, 973 F.2d 333, 336 (4th Cir. 1992). In making that showing, "[t]he government bears the heavy burden of proving that all of the evidence it proposes to use was

4

derived from legitimate independent sources" by a preponderance of the evidence. *Id.* (quoting *Kastigar* at 461-62)(quotations omitted). The district court's "determination is a factual finding subject to review under the clearly erroneous standard." *Id.* at 337 (citations omitted).

### III. Analysis

The Supreme Court held that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination," which is Constitutionally protected. *Kastigar*, 406 U.S. at 453. In cases where a witness has been given use immunity, there is a "total prohibition on use" of that evidence, which "provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460. Defendant was given use and derived use immunity for the statement he gave to DSS Agents when interviewed in Kiev. The prosecution must not have used any evidence obtained from the interview against Defendant or as an investigatory lead. If it has done so, the Court must consider whether the use of the testimony was completely harmless or if dismissal of the indictment is appropriate. *Harris,* 973 F.2d at 338.

Defendant asserts that the Government used Defendant's

5

immunized testimony to shape their investigation. In particular, he argues that "JD1 and JD2 had their stories shaped by investigators with knowledge of the immunized statements." Mem. in Sppt. of Def's Mot. at 10.

The Government argues that it took precautions in line with Fourth Circuit precedent, following "[t]he usual precautions, . . . [which] are for the government to insulate a prosecutor and/or investigator who is familiar with the immunized statement from subsequent prosecution of the compelled witness or to seal the incriminating documents." *United States v. Harris*, 973 F.2d 333, 337 (4th Cir. 1992). The agents and prosecutors initially involved in the case were removed after the immunized interview before any further interviews took place. The initial assignment from SA Falanga to the new agents on the case also made it clear that contact between the new agents and parties with exposure to the statement should be limited, and AUSA Haynes testified that she instructed the new agents working on the case that "there was to be no contact at all. And once we figured out who was aware of the statement, who was not aware of the statement, after that, quite some time into the investigation, then we allowed limited contact as to certain matters," with the continued understanding that the statement was not to be discussed or to shape the conversations in any way. Hr'g Tr. 75:17-21, Jan. 17, 2008.

The new agents and prosecutors had no knowledge of the contents of the immunized interview, which was never available to them.  JD1 was initially interviewed before Defendant made his statement, and his statement is what prompted the investigation. According to the government, the interview of JD1, and nothing obtained from Defendant, provided guidance for the direction of the investigation and forms the requisite legitimate, independent source for its line of investigation and witness testimony.

Defendant places great weight on a statement made by SA Falanga to AUSA Haynes in an email in which SA Falanga writes that "subject interview did not reveal any new info."  Def.'s Mot. to Dismiss the Indictment for Prosecutorial Misconduct Ex. 1 at 2.  The Court notes that this statement, although perhaps ill-advised, in no way shapes the investigation or illuminates the specific contents of the statement.  When asked if "the information obtained from Paul Guild's statement [would] have impacted [her] investigatory course of action in any way," or if she "[w]ould ... have relied on that statement to obtain any investigative leads," SA Falanga answered in the negative.  Hr'g Tr. 21:7-11, 19-22, Dec. 14, 2007.  The agent removed herself from the case as soon as she realized that there was a taint, but also notes that the statement would not have shaped her investigation in any way.  Her testimony is bolstered by the email she sent to AUSA Haynes, particularly her comment that

"[b]oth subjects were intifyed [sic] prior to subject interview." Def's Mot. to Dismiss Ex.1 at 2. Not only did SA Falanga not guide the investigation of the case, but her reaction to the statement lends further credence to the Government's assertion that the investigation was shaped by information obtained prior to or independent from the immunized statement.

      The Government's primary trial witnesses were the two victims, JD1 and JD2, their mothers, and JD1's stepfather, all of whom testified that they had no knowledge as to the contents of the immunized statement.[1] Hr'g Tr. 166:1-13; 131:14-25; 121:14-23; 150:9-23; 175:10-21, Jan. 17, 2008. In addition, the Government adduced testimony from SA Allen, who testified that he had no knowledge of the contents of the statement. Hr'g Tr. 62-32, Dec. 14, 2007. The Government also called Mr. Alonzo Fulgham as a rebuttal witness, but his testimony went only to the character of one of their initial witnesses and was unrelated to the allegations against Defendant or any matter that could have stemmed from the immunized statement. The only witness the Government called who had been given some knowledge of the contents of Defendant's statement was Ms. Prekup. Her knowledge of the statement was very vague and limited, came the day after that statement was given, on August 6, 2007, and was not

---

[1] The Court notes that it found Government witness's testimony to be credible.

refreshed in any manner. Hr'g. Tr. 188-90, Jan. 17, 2008. Her testimony at trial was limited to questions of fact, including her interactions with the Guild children, JD1 and his family, and with JD2 while he stayed with her in Kiev and while she accompanied him to the United States. Ms. Prekup participated in one interview with JD1, on November 7, 2007, in Kiev, but there is no indication that she was there as anything other than a medical support, nor that she participated in the substantive questioning in any way that could shape his testimony. *Id.* at 195:2-8. In addition, she spoke with JD1's stepfather by phone on several occasions in early August, but did not tell him of Defendant's statement. *Id.* at 175:10-21; 193:13-19. Therefore, despite Ms. Prekup's exposure to some aspect of the immunized statement, the Government has demonstrated by a preponderance of the evidence that the subject of her testimony is not derived from the statement and that her knowledge of it was not conveyed to other witnesses or investigators to shape the investigation or other evidence.[2]

   A Safe Shores employee, Diamond Vann, had some knowledge of the immunized statement and was therefore asked not to interview JD2. Defendant presented some evidence that she

---

[2] The Court notes that Defendant declined the Government's offer to allow the Court to examine Ms. Prekup in camera, in the courtroom without them present, or in front of another AUSA who would not be involved in the trial in order to allow him further opportunity to ascertain the extent of her knowledge of the statement. Hr'g Tr. 200.

viewed at least a portion of an interview at Safe Shores with JD1.  She did not, however, participate in the interview.  The agents who were also present were well aware of the importance of shielding themselves and the witnesses from any knowledge of the contents of the statement.  The Court finds that her viewing the interview in the company of the agents, without participating in it, did not in any way shape the investigation in this case.

This Court finds that the Government has demonstrated, by a preponderance of the evidence, that the evidence it used at trial was "derived from a legitimate source wholly independent of the compelled testimony."  *Kastigar*, 406 U.S. at 460.

### IV. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment for Violation of his Constitutional Rights Under *Kastigar v. United States* will be denied.

An appropriate order will issue.

February 6, 2008                                /s/
Alexandria, Virginia                    James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE